FILED

2011 Feb-25  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| R.G., BY AND THROUGH C.G., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO.:   7:09-cv-1369-RDP |
| | § | |
| DEPARTMENT OF MENTAL | § | |
| HEALTH, ET AL., | § | |
| | § | |
| Defendants. | § | |

## NONMOVANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   TABLE OF CONTENTS.......................................................................i

   A.   LIST OF EXHIBITS.................................................................i

      1.   Pl.'s Ex. 1 - Indictment

      2.   Pl.'s Ex. 2 - Taylor Hardin Transfer Referral Summary

      3.   Pl.'s Ex. 3 - Letter from Department to Taylor Hardin

      4.   Pl.'s Ex. 4 - Forensic Evaluation Report, January 8, 1986

      5.   Pl.'s Ex. 5 - Letter from Department to Circuit Judge

      6.   Pl.'s Ex. 6 - Letter from District Attorney to Department

      7.   Pl.'s Ex. 7 - Privilege Log

      8.   Pl.'s Ex. 8 - Program Support Plan for R. G.

      9.   Pl's Ex. 9 - Excerpts from Deposition of Veronica Jones

10. Pl.'s Ex. 10 - Excerpts from Deposition of Michael Bailey

11. Pl.'s Ex. 11 - Excerpts from Deposition of Rebecca Bellah

12. Pl.'s Ex. 12 - Declaration of R. G.

13. Pl.'s Ex. 13 - Client Accountability Sheet for R. G.

14. Pl.'s Ex. 14 - Letter from Partlow Director

15. Pl.'s Ex. 15 - Partlow Application of Stanley Gay

16. Pl.'s Ex. 16 - Excerpts from Deposition of Angela Sims

17. Pl.'s Ex. 17 - Defendant's Response to Discovery Requests

18. Pl.'s Ex. 18 - Partlow Policy 19-10

19. Pl.'s Ex. 19, Excerpts from Deposition of Stanley Gay

20. Pl.'s Ex. 20 - Excerpts from Deposition of Michael Bailey

21. Pl.'s Ex. 21, Special Considerations Sheet for R. G.

22. Pl.'s Ex. 22 - Written Reprimand of Stanley Gay

23. Pl.'s Ex. 23 - Excerpts from Deposition of Gerald Boyd

24. Pl.'s Ex. 24 - Excerpts from Depo of C. G. (R.G.'s mother)

25. Pl.'s Ex. 25 - 2009 FY Annual Report of Department

26. Pl.'s Ex. 26 - Order for Appointment of Guardian for R. G.

27. Pl.'s Ex. 27 - Affidavit of C. G.

28. Pl.'s Ex. 28 - CMS Letter to Partlow

II.    ARGUMENT AND CITATIONS OF AUTHORITY.......................................2

III.   STATEMENT OF FACTS.................................................................2

       A.    RESPONSE TO MOVANT'S STATEMENTS.......................................2

       B.    ADDITIONAL UNDISPUTED FACTS....................................................3

IV.    SUMMARY OF THE FACTS.........................................................13

V.     ANALYSIS.................................................................................17

       A.    § 504 REHABILITATION ACT CLAIMS...........................................17

       B.    42 U.S.C. § 1983 CLAIMS....................................................20

       C.    STATE LAW CLAIMS.........................................................27

VI.    CONCLUSION.........................................................................37

VII.   CERTIFICATE OF SERVICE.........................................................38

1

## II.  ARGUMENT AND CITATIONS OF AUTHORITY

This action is brought against the Alabama Department of Mental Health ("Department") under § 504 of the Rehabilitation Act of 1973, 42 U.S.C. 794(a) ("§ 504").   The individual defendants are sued (in their individual capacities only) under 42 U.S.C. § 1983 ("§ 1983") for injury to the plaintiff's rights secured by the 14th Amendment, and under state law for failure to perform certain non-discretionary duties.    The defendants have moved for summary judgment on every claim, and their motion as to each is due to be denied.

## III.  STATEMENT OF FACTS

### A.  RESPONSE TO MOVANT'S STATEMENTS:

5.   Denied that R. G. had a history of violence.   (Pl.'s Ex. 24 at 83-84; Pl.'s Ex. 23 at 17-18, 20).

11.   Denied that there was no policy about patients being alone in a room together. (See Pl's Ex. 22; Pl.'s Ex. 23 at 26-27, 31-32, 48, 51-53; Pl.'s Ex. 9 at 42, 47; Pl.'s Ex. 16 at 42, 47).

10.[1]  Denied that R. G. was on 1 staff to 2 patient or 1 staff to 3 patient supervision. (Pl.'s Ex. 23 at 27, 43).

17.   Denied that no penetration took place.   (Pl.'s Ex. 23 at 40-41; Pl.'s Ex. 24 at

---

[1]    There are two paragraph 10's in the Defendant's Initial Statement of Undisputed Facts.   A few other paragraphs are inadvertently repeated.

153).

## B.   ADDITIONAL UNDISPUTED FACTS

1.    On April 10, 1986, T. H.[1] was indicted for First Degree Sodomy for having sex with a male child less than twelve years old. (Pl. s Ex. 1, Indictment at 2).

2.    After being found mentally incompetent to stand trial, T. H. was probate committed to Taylor Hardin Secure Medical Facility (Taylor Hardin).[2]   (Pl. s Ex. 2, Transfer Referral Summary).

3.    On July 6, 1986, the Department of Mental Health s ("Department") Regional Director wrote that T. H. was ineligible for admission to Partlow Developmental Center ("Partlow") because he was too high functioning, was charged with Sodomy, was psychotic and had a   history of repeated sexual offenses toward small children.   (Pl. s Ex. 3, Letter from Department at 2).

4.    T.H. was mildly mentally retarded, schizophrenic, 6 2, "very tall and rather stocky. (Pl. s Ex. 4, Forensic Evaluation Report).

5.    On March 5, 1991, the Department told the Circuit Court that T. H. was being moved to a group home.   (Pl. s Ex. 5, Letter from Department).

---

[1]    To protect privacy rights of the patients involved, Plaintiff s counsel will use initials to refer to the patient who committed the rape.

[2]    Taylor Hardin is a facility for the criminally insane.   (Pl.'s Ex. 17, Depo of Mental Health Worker Angela Sims at 58).

6.     In response, the District Attorney warned the Department, "Our <u>main concern</u> is that the above individual <u>not be allowed around minor boys</u>, or girls for that matter, unless he is closely supervised."   (Pl. s Ex. 6, Letter from District Attorney).

7.     After his admission to Partlow, T. H. s Privilege Log documents further acts of sodomy:   1) May 4, 1999 - T. H. was performing oral sex and   other things   on another patient; 2) August 22, 2001, T. H. was seen rubbing another patient s buttocks; 3) November 4, 2001 - T. H. was witnessed putting another patient s hand down the front of his pants; 4) February 28, 2002 - T. H. reported another patient put his penis in his rectum.   (Pl. s Ex. 7, Privilege Log).

8.     R. G. ("Rod") was admitted to Partlow on October 5, 2004 with a diagnosis of mild mental retardation, IQ of 40, partial paralysis and Cerebral Palsy secondary to bacterial meningitis suffered as an infant.   (Pl. s Ex. 8, Program Support Plan at 1).

9.     Rod did not have a history of sexual misconduct.   (Pl s Ex. 9, Depo of Veronica Jones at 22).

10.    Rod lived in Home 10, Apartment D at Partlow where he was required to remain and could not leave the premises.   (Pl. s Ex. 10, Depo of Michael

4

Bailey at 37; Pl. s Ex. 11, Depo of Rebecca Bellah at 40).

11.    On March 5, 2008, Rod reported to Mental Health Worker I ("MHW") Gerald

Boyd that he was sexually assaulted the Friday before (February 29, 2008), by

his roommate, T. H    (Pl. s Ex. 23, Depo of Boyd at 40-41; Pl. s Ex. 12,

Declaration of R. G.).

12.    Rod told Gerald that Stanley Gay, MHW I, was right outside Rod s door,

looking into the room, when T. H. raped him.   (Pl. s Ex. 12, Declaration of R.

G.).[1]

13.    Rod stated that T. H. had held him down, removed his diaper and "stuck it in

his butt."    (Pl. s Ex. 23, Depo of Boyd at 40-41).

14.    Gerald Boyd knew Rod well enough to know that Rod was truthful.   (Pl. s

Ex. 23 at 41-42).

15.    Rod did not have a reputation for sexual misconduct and never expressed any

interest in sex or boys.   (Pl. s Ex. 23, Depo of Boyd at 44-45, 70; Pl. s Ex. 19,

Depo of Gay at 25).

---

[1] "The fact that a person's mental disorder renders him incapable of managing his own affairs, that he is under guardianship or that he, by reason of the mental disorder, is kept confined in a hospital for the mentally ill, does not necessarily disqualify him to be a witness."   Orton v. Gay, 285 Ala. 270, 277, 231 So. 2d 305 (19750).  In fact, in Rod's Individual Support Plan, the Department noted that Rod "communicates well", "knows all colors", "knows personal data", 'can recite and write letters of the alphabet", "can write numbers in a sequence", "can tell time by the hour", "can state his full, name, age and birthday", "can dial a phone", "print his name" and "identify the days of the week."   (Pl.'s Ex. 8 at 11).

16.  It would be a clear violation of Department policy if a staff member saw a sexual assault and failed to report it or intervene to stop it.  (Pl. s Ex. 9, Depo of Jones at 29-30; Pl. s Ex. 16, Depo of Sims at 43).

17.  If an employee was responsible for watching Rod and he had sex with another patient "that would be a situation of neglect, yes, there would be disciplinary action."  (Pl. s Ex. 11, Depo of Bellah at 101).  (Emphasis added).

18.  Gay was responsible for supervising Rod from 6:30 p.m. to 10:30 p.m. on February 29, 2008.  (Pl. s Ex. 13, Client Accountability Sheet at 1).

19.  Gay has been fired by Partlow for violating Policy 19-10, which protects patients from abuse and mistreatment.  (Pl. s Ex. 14, Letter from Partlow Director).

20.  Gay received numerous written reprimands at Partlow, including inattention to duties, tardiness, threatening and verbally abusing patients, and poor job performance.  (Pl. s Ex. 14).

21.  Gay wrote on Partlow application that he was convicted of Theft III.  (Pl. s Ex. 15, Employment Application).

22.  According to the Department s corporate representative, Gay would be disciplined for neglect if someone had sex with Rod while Gay was supposed to be watching him.  (Pl. s Ex. 11, Depo of Rebecca Bellah at 101, 105).

6

23.   When explaining the sexual assault to Rod's mother, Partlow's Director told her that Rod "may be gay" and that the sex with T.H. was consensual.   (Pl.'s Ex. 24, Depo of C. G. at 165, 204).

24.   Rod s mother told Partlow s Director she wanted the rape referred to the Tuscaloosa Police Department but he only referred it to Partlow police.   (Pl. s Ex. 24 at 167).

25.   Veronica Jones is a Mental Health Worker III[1] in Unit 3, Home 10.   (Pl.'s Ex. 9, Depo of Jones at 57).

26.   Ms. Jones was terminated twice by Partlow, once for patient abuse and once for an altercation with a co-worker.   (Pl. s Ex. 9 at 64).

27.   Ms. Jones <u>claims</u> she was not aware of a Taylor Hardin transferee in Home 10 with a history of First Degree Sodomy but, as a MHW III, this is something the Department should have told her because Taylor Hardin transferees pose a danger.   (Pl. s Ex. 9 at 48, 51-52, 56-57).

28.   As a MHW III, she would not want a patient in a room at night with someone who has T.H.'s history and it would be a failure on the Department's part to place a patient in that situation.   (Pl. s Ex. 9 at 59-61).

---

[1]   A MHW III is the most senior mental health worker who supervises MHW I's and II's.   A MHW I is the lowest level of MHW and they assist patients with activities of daily living. (Pl. s Ex. 8 at 18).

29.   Angela Sims is a MHW II in Unit 3 Home 10.   (Pl. s Ex. 16,   Depo of Sims at 58).

30.   Policy 19-10 is a Partlow policy designed to protect patients from abuse, neglect, mistreatment, exploitation by all staff members. (Pl. s Ex. 9, Depo of Jones at 22; Pl. s Ex. 18, Partlow Policy 19-10).   It also applies to sexual assault.   (Pl. s Ex. 9 at 21).

31.   Gay testified that employees have no discretion in the areas of patient care and safety.   (Pl. s Ex. 19, Depo of Gay at 16-17).

32.   If a policy was in writing, Gay had to follow it to the letter and had no discretion about whether he could violate Policy 19-10.   (Pl. s Ex. 19 at 21).

33.   Because they do have the capacity to consent, Partlow patients are not allowed to have sex.   (Pl. s Ex. 19, Depo of Gay at 24; see also, Pl. s Ex. 11, Depo of Bellah at 24).

34.   If two patients engaged in even consensual sex during Gay s watch, it would be considered neglect by Gay.   (Pl. s Ex. 19 at 23-23).

35.   Gay admitted that he would have violated Department policy if Rod was sexually assaulted while Gay was responsible for supervising him.   (Pl.'s Ex. 19 at 37).

36.   Gay has no choice or discretion but to protect patients like Rod from sexual

assaults by other patients while Rod is in his bedroom.   (Pl.'s Ex. 19 at 38).

37.   Michael Bailey (who has since been fired for patient neglect) was a MHW I at Partlow responsible for supervising Rod.   (Pl.'s Ex. 20 at 14, 16, 18, 22).

38.   If Rod was sexually assaulted while Bailey was supposed to be supervising him, Bailey would be in violation of Department policy.   (Pl.'s Ex. 20 at 32-33).

39.   Partlow sexual harassment policy prohibits staff-on-staff sexual harassment but there is no similar policy for patients.   (Pl.'s Ex. 11, Depo of Bellah at 91).

40.   Partlow's corporate representative, Rebecca Bellah, testified that the incident between T.H. and Rod was sexual misconduct.   (Pl.'s Ex. 11 at 51).

41.   Each Partlow patient has a Special Considerations sheet, a very important document that provides detailed information for each MHW in how to care for the particular patient.   (Pl.'s Ex. 11, Depo of Bellah at 99; Pl.'s Ex. 9 at 38).

42.   Employees have no choice but to follow the Special Considerations Sheet to the letter and cannot deviate from it.   (Pl.'s Ex. 9 at 38; Pl.'s Ex. 11 at 64, 66, 71, 99, 100-101; Pl.'s Ex. 16 at 51-52).

43.   "[B]ut the special considerations sheet is something that all staff are instructed to read, to follow, to know, and you've got to look at it every day.

It's actually in a notebook that goes with them wherever they go."   (Pl.'s Ex. 11 at 70).

44.   Rod's Special Considerations Sheet requires MHW's to "Always position yourself between [Rod] and other clients."   (Pl.'s Ex. 21).

45.   Department policy requires that MHW's cannot leave two patients alone in an unmonitored room.   (See Pl.'s Ex. 22, Written Reprimand).[2]

46.   If two patients are alone in a bedroom together, a MHW is required to be either inside the bedroom or sitting in the hallway where they can see into all of the bedrooms.   (Pl.'s Ex. 23 at 31-32, 48, 51-53).

47.   Veronica Jones, MHW III, testified that she would <u>reprimand</u> an employee if she came into Home 10 and found two patients alone in a bedroom together without a MHW monitoring the bedroom.   (Pl.'s Ex. 9 at 42, 47).

48.   Gerald Boyd[3] testified that, when you were monitoring Rod in his bedroom, you had to make sure that you were sitting "[i]nside the doorway itself.   I just had to make sure my eyes are on him, especially if there was another individual in the room."   (Pl.'s Ex. 23 at 26-27).

_____

[2]   "On October 27, 2003, you worked on Apartment 10C.   During your shift, two of the clients were in the bedroom together which <u>should not have occurred with appropriate monitoring</u>.   It is critical to maintain close supervision of all clients on Apartment 10C at all times."   (Pl.'s Ex. 22).

[3]   Gerald Boyd is a MHW I who was responsible for supervising Rod.

49. This is a rule that Mr. Boyd would have had no choice but to follow under Department policy.   (Pl.'s Ex. 23 at 53).

50. Angela Sims testified that if two patients were alone in a room together, a MHW must be at the door.   (Pl.'s Ex. 16 at 42).

51. Gerald Boyd has worked with Rod since Rod came to Partlow and was principally in charge of supervising him.   (Pl.'s Ex. 23 at 16-17).

52. Gerald knows of no other MHW than himself with more knowledge of Rod. (Pl.'s Ex. 23 at 17).

53. In sharp contrast to the Department's description of Rod, Gerald described Rod as physically handsome, wheelchair bound and a patient that everyone liked.   (Pl.'s Ex. 23 at 18, 20).

54. Although the Department attempted to characterize Rod's supervision level as freedom of movement within a group, Gerald testified that "basically he was still <u>one-on-one</u>, but he was in a group at the time."   (Pl.'s Ex. 23 at 43).

55. Gerald testified that his main patient was Rod, <u>even when</u> Rod was in a group situation.   (Pl.'s Ex. 23 at 27).

56. Before Rod was raped, Gerald Boyd told Rod's mother that Partlow was not a good place and Rod did not need to be there.   (Pl.'s Ex. 24 at 126).

57. Also before the rape, Stanley Gay told Rod's mother that she needed to get

him out of Partlow because of his roommate, T. H.   (Pl.'s Ex. 24 at 127-129).

58.   Both Gay and Bailey, before the rape, warned Carolyn that T. H. was a sexual person who shouldn't be in Rod's room.   (Pl.'s Ex. 24 at 129-131, 185).

59.   After these conversations with Bailey and Gay, and before the rape, Carolyn called Partlow's Director, Vance Liles, and told him what had been told to her about T.H.   (Pl.'s Ex. 24 at 129-130).

60.   The Department receives millions of dollars each year from the federal government, including over $500,000,000 from Medicare and Medicaid in 2009 alone.   (Pl.'s Ex. 25, Department 2009 Fiscal Year Report).

61.   Rod left Partlow in November 2008 and moved into a group home operated by ARC of Jefferson County.   (Pl.'s Ex. 24 at 47).

62.   Rod is no longer eligible for a group home because he had to have a tracheotomy after moving to the ARC group home.   (Pl.'s Ex. 24 at 50).

63.   Carolyn is Rod's legally appointed guardian.   (Pl.'s Ex. 26, Guardianship Order).

64.   She became very angry about all of the things that were happening to Rod at Partlow.   (Pl.'s Ex. 24 at 110).

65.   Partlow employees kept reassuring her that Rod was safe and it would not happen again.   (Pl.'s Ex. 24 at 110).

66.    Gerald Boyd brought Rod home the very next day after the rape and told her that T.H. had sexually assaulted other patients before this.   (Pl.'s Ex. 24 at 148, 150).

67.    The next day, Rod told his mother that T. H. came over to Rod's bed, pushed Rod on his left side, which was his strong side, where Rod could not get back over and "stuck his d#*k in him."   (Pl.'s Ex. 24 at 153).

68.    After the incident, Rod became quieter when talking to people and still does not talk as much as he used to.   (Pl.'s Ex. 24 at 161).

69.    Carolyn had no choice but to remove her son from Partlow because he was not physically or emotionally safe at Partlow.   (Pl.'s Ex. 27, Affidavit of Carolyn).

70.    On October 24, 2008, the Alabama Department of Health conducted a survey of Partlow and determined that "conditions within Partlow pose an immediate jeopardy to the health and safety of the clients."   (Pl.'s Ex. 28, CMS Letter).

## IV.   SUMMARY OF THE FACTS

The plaintiff, identified in the pleadings as R. G. (referred to herein as "Rod" as he is known to his family), was a resident of Partlow State School and Hospital ("Partlow") when he was raped by another resident, T. H.   Partlow is the principal facility operated by the Department for the habilitation and care of individuals with

13

significant developmental disabilities.

Rod has a variety of mental and physical impairments caused by severe bacterial meningitis he suffered shortly after birth in a U.S. Army hospital in Germany.   Rod's parents were serving in the U.S. Army and were stationed in Europe at the time.   The illness left Rod largely without the use of both legs and one arm.   He is confined to a wheelchair and cannot perform any normal activities of daily living without full assistance.   Rod was also left with significant intellectual deficits.   Although he can speak and respond to certain questions, and was chronologically twenty-five years old at the time he was raped, Rod's mental abilities are those of a seven year-old child.

The defendants assigned Rod and T. H. to the same bedroom.     At the time he raped Rod, T.H. was over fifty years old, fully ambulatory, six feet two inches tall and weighed more than two hundred pounds.   T. H. was only mildly mentally retarded and, because of his relatively high level of intellectual functioning, did not meet the commitment criteria to Partlow or the Department's other facilities for the developmentally disabled.   In 1986 while in his twenties T. H. was charged with the crime of first degree sexual assault and sodomy of a male child less than 12 years old.   T.H. was sent to the Department by the Jefferson County Circuit Court for mental evaluation.

At the Taylor Hardin Secure Medical Facility ("Taylor Hardin"), the Department's facility for evaluating and housing individuals charged with serious crimes or posing direct threats to others, T. H. was diagnosed with "mild mental retardation, psychosis and schizophrenia", and was found to be unable to stand trial criminally at that time.   He was civilly committed to Taylor Hardin, which then tried to have him transferred to another facility.   Initially, this transfer was opposed by the Department's own officials, who believed that T. H.'s relatively high level of intellectual functioning, his diagnosis of psychosis and need for strong medication to control it, his pending criminal charges and his "history of repeated sexual offenses toward small children" made him unsuitable for placement in a mental retardation facility.   (Pl.'s Ex. 3, Letter to Taylor Hardin at 2).   In spite of the concerns of the Department's own specialists, Taylor Hardin continued efforts to transfer T. H. When the Deputy District Attorney who monitored the pending criminal charges was notified that the Department intended to move T. H. to a group home, he warned the Department that, "Our main concern is that the above individual [T.H.] not be allowed around minor boys, or girls for that matter, unless he is closely supervised." (Pl.'s Ex. 6, Letter from District Attorney).

In spite of these warnings T. H. was moved to Partlow, placed in the midst of helpless boys, young in years or intellect, and who were often unable either to resist

or report sexual assault.   As is clear from the facts of this case, T. H. was not given the close supervision that was required to protect Rod and the other patients.

While at Partlow, T. H. continued his sexual exploitation of others who were helpless to protect themselves.   Unlike Rod, many or perhaps most of the residents of Partlow are not able to express themselves verbally and are not able to report when they have been sexually assaulted.   Thus, T. H.'s full history of sexual assault on other Partlow residents can never be known.   Even with that limitation, there are several reported examples of T. H.'s sexual acts in his record.   These include self-reports of both oral and anal sodomy with other patients.

Before her son was raped, Rod's mother was told by mental health workers at Partlow that T. H. had a history of sexual assault of other residents.   She met with the Director of Partlow to discuss the warnings of the mental health workers and her fears for her son's safety.   She was assured by the Director that Rod would be protected from sexual assault by T. H.   After the rape, Rod's parents no longer believed that their son could or would be protected by Partlow, and insisted that he be removed from that facility to a safer placement.   Rod was moved from Partlow to a community facility that, although it did not have Partlow's range of habilitation care, at least did not subject him to assault by known sexual predators.

The assault on Rod was the result of both institutional and individual failures.

16

In placing a high-functioning, physically dominating person with a proven record of sexual aggression and assault into confined quarters with patients, most of whom could neither defend themselves nor report when they had been attacked, the Department failed in its duties to make the benefits of its programs and facilities accessible to the disabled.  By its failure to provide the supervision, training and numbers of staff to ensure that patients were protected from assaults of other patients, the Department compounded its default.  The individual defendants who did not follow the prescribed policies and procedures for patient observation, supervision and protection also made the assault on Rod possible.

IV.   **ANALYSIS**

   A.   **§ 504 REHABILITATION ACT CLAIMS**

Section 504 protects the rights of the disabled to benefit from federally assisted programs. As a condition to the receipt of federal funds, state agencies and institutions are required to waive their 11th Amendment immunity for actions under a variety of anti-discrimination laws, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972 and § 504.  The 11th Circuit held that, "[42 USC] Section 2000d-7 unambiguously conditions the receipt of federal funds on a waiver of Eleventh Amendment immunity to claims under section 504 of the Rehabilitation Act."   Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.,

344 F.3d 1288, 1293 (11th Cir. Ala. 2003).

In this case the Department does not contest that it is a recipient of federal funds and subject to § 504.   Nor does it contend that it is immune from this action under the 11th Amendment, or that Rod is not disabled.   Rather, in its motion for summary judgment on the § 504 claim, the Department simply denies that it "discriminated" against Rod on account of his disability.   (D's Brief p. 15). Respectfully, in this argument, the Department shows a fundamental misunderstanding of its obligations under §504 and of the nature of the plaintiff's claims.

The "discrimination" that § 504 (and Title VI and Title IX as well) protects against is an exclusion from or denial of the benefits of a federally-assisted program. The statute itself could not be clearer:

> (a) ... No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C.S. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance... 29 USCS § 794.[9]

The disabled can suffer this type of discrimination in a variety of ways.   In Barnes v. Gorman, 536 U.S. 181 (U.S. 2002), the Court upheld a compensatory

---

[9] See also 34 CFR 104.52 for implementing regulations for federal funding recipients providing health services.

damage verdict under the ADA and § 504 by a wheelchair-bound arrestee who was injured when government officials failed to secure him properly as he was being transported.[10]   Barnes at 184-185.   In Tennessee v. Lane, 541 U.S. 509 (U.S. 2004) (a decision primarily cited for its holding that Title II of the ADA was an effective abrogation of 11th Amendment immunity), the Court held that architectural barriers in courthouses exclude, and thus illegally discriminate against, the paralyzed in violation of Title II of the Americans with Disabilities Act.   It recited examples from other cases of some of the types of discriminatory treatment that states had visited upon their disabled citizens.   Among these was Youngberg v. Romeo, 457 U.S. 307 (U.S. 1982), holding that mental patients have a constitutionally protected interest in their personal safety:

> The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings, including...the abuse and neglect of persons committed to state mental health hospitals, Youngberg v. Romeo, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982)... Tennessee v. Lane, 541 U.S. 509, 524 (U.S. 2004) (emphasis supplied)

These decisions only confirm the principle that has governed this Circuit and Partlow directly for decades.   In Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir. Ala.

---

[10]  In Barnes the Court also held that the remedial provisions of the ADA and Section 504 were the same and that both permitted compensatory but not punitive damages against governmental entities.

1974) the Fifth Circuit substantially affirmed Judge Johnson's findings that the conditions at Partlow violated patients' constitutional rights to protection from assault and brutality at the hands of other patients:

> The patients [at Partlow] suffered brutality, both at the hands of the aides and at the hands of their fellow patients; testimony established that four Partlow residents died due to understaffing, lack of supervision, and brutality. One of the four died after a garden hose had been inserted into his rectum for five minutes by a working patient who was cleaning him; one died when a fellow patient hosed him with scalding water; another died when soapy water was forced into his mouth; and a fourth died from a self-administered overdose of drugs which had been inadequately secured.

Wyatt v. Aderholt, 503 F.2d 1305, 1310-1311 (5th Cir. Ala. 1974).

The failure to protect mental patients from sexual assault by a known sexual predator is as sure an act of discrimination as is any architectural barrier or vehicle accommodation.   His parents were absolutely responsible in their insistence that the failure to protect their son required his removal from the facility that was best equipped to provide for his treatment and habilitation.   The Department's claim that its failure to protect Rod from being raped by another resident is not "discrimination" falls before the weight of all controlling authority.

### B.      42 U.S.C. § 1983 CLAIMS

The duty to protect patients in a mental facility from assault by other patients and staff members is firmly established in the law.   In its seminal articulation of the

20

"special relationship" doctrine, the Court in <u>Deshaney v. Winnebago County Dep't of Social Services</u>, 489 U.S. 189 (U.S. 1989), held that there was no constitutional duty to protect a foster child who was not in state custody from injuries by family members.   In contrast, the Court explained that there was a long-established duty to protect prisoners and mental patients which accompanies the removal of their ability to protect themselves. "[T]he affirmative duty to protect (prisoners and mental patients) arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."   <u>Deshaney</u>, 489 U.S. at 200.   In <u>Deshaney</u> the Court reaffirmed its earlier holding in <u>Youngberg v Romeo</u>, directly confirming the affirmative duty to protect patients in mental health facilities.   [11]

Although conceding that they were "state actors" within the meaning of 1983 and thus subject to suit under that statute (Ds' Br. P. 13), the individual defendants assert that they are protected by the doctrine of qualified immunity.   Their defense appears to rest on three principal arguments - two based on factual disputes and one on a matter of law.   They cannot prevail as a matter of either fact or law.

---

[11]   As discussed in reference to the § 504 claim, the assaults and brutality of Partlow patients toward one another was an important component of the <u>Wyatt</u> litigation and a basis for the Fifth Circuit's affirmance of Judge Johnson in 1974.

These defendants take issue with certain of the plaintiff's evidentiary showings on two components of the suit.   First, they contend that, "...the Plaintiff is unable at this point to demonstrate what sort of sexual contact occurred or when it occurred." (Ds' Br. P 14) This is another iteration of defendants' shifting positions on the rape itself throughout the litigation.   They have variously denied that any sexual contact occurred, and even claimed that Rod engaged in consensual sex.   The evidence of record is clear that Rod complained very specifically, and even graphically, to Partlow employees and to his parents that he had been subjected to anal sodomy by T. H.   (Pl.'s Ex. 23, Depo of Boyd at 40-41). Even the superficial investigation conducted by Partlow concluded that some type of sexual contact had occurred.   Partlow's uncertainty about the precise nature of the sexual assault stands in direct contrast to Rod's own very clear report.

The second fact-based defense to the 1983 claims is that these defendants deny doing anything wrong.   Once again, the record has ample evidence to the contrary.   These were the three staff members principally charged with observing Rod and T. H.   They were each obliged to follow Partlow guidelines, checklists and procedures to ensure Rod's safety.   As is described in detail in the state law section of this brief, there were a series of failures which resulted in this rape.   Some are described in direct reports by Rod.   Some failures are obvious from the

22

circumstances.  For instance, because most or all Partlow patients lack the legal capacity to consent to sex, under Partlow policy no sexual contact was permitted between patients.  (Pl.'s Ex. 11, Depo of Rebecca Bellah at 24).   To enforce this policy, Partlow required that staff members always be in a position to monitor activities of patients in their bedrooms.   Defendants Gay and Bailey were responsible for physically monitoring Rod and T. H. in their bedroom.   If, as Rod reported and Partlow's own investigatory report concluded, there was sex between Rod and T. H., and if that sex was not observed by Partlow staff, there was clearly a breach of policy.   (Pl.'s Ex. 11, Depo of Partlow Corporate Representative, Rebecca Bellah at 101).   These are not the types of factual disputes that can be resolved by summary judgment.

The defendants' legal argument relies principally on one 11th Circuit decision, DS [Stinson] v. County of Montgomery, 286 Fed. Appx. 629; 2008 U.S. App. LEXIS 14237 (11th Cir. 2008), addressing the rape claims of a detainee in a youth detention facility.   Stinson was an appeal from the denial of qualified and state agent immunity summary judgment motions in the district court.   The plaintiff was raped by another detainee, and brought suit under 1983 and state law.   The 11th Circuit reversed the district court's denial of qualified immunity on the 1983 claim, but affirmed the denial of state agent immunity.   The court's rationale on both

23

components of its decision, when applied to the facts of this case, provide strong authority for the denial of the pending motion, on both the 1983 and state law claims.

The Stinson court's principal basis for finding qualified immunity to the 1983 claims was that:

> [T]here is simply insufficient evidence to create a factual issue as to whether the Officers were subjectively aware of, and were deliberately indifferent to, a substantial risk of serious harm to D.S. As of April 2002, detainee-on-detainee violence was "very rare" at MCYF, and the facility's Detention Director and Juvenile Court Administrator each testified that before April 18, 2002, no detainee had complained of being sexually assaulted while at MCYF. Moreover, C.P. had no history of sexual assault.

D.S. v. County of Montgomery, 286 Fed. Appx. 629 (11th Cir. Ala. 2008).

Contrast the Stinson holding with the facts of record in this case.   Here, T. H. was committed to Partlow solely by virtue of his record of sexual assault.   He came to Partlow with a demonstrated history of "repeated sexual offenses".   (Pl.'s Ex. 3, Letter from Department at 2).   (Emphasis added).   In spite of that record, his acknowledged unsuitability for placement in a facility like Partlow and the hazard he posed to other patients and staff, the Department placed T. H. at Partlow where he compiled a record of confirmed and impermissible sexual contact with other patients.   This record was known to defendants Gay and Bailey and to the facility director. (Pl.'s Ex. 27, Affidavit of C. G. at ¶ 6-7; Pl.'s Ex. 24 at 129-30).   It was reflected in T. H.'s charts and in the Department's own correspondence files

24

concerning T. H.'s placement.   Defendant Jones, the MHW III in charge of the shift, claimed in deposition that she did not know of T. H.'s history of sexual assaults, either at Partlow or before.   (Pl.'s Ex. 9, Depo of Jones at 57).   Her denial is not credible.   If both her subordinates and supervisors knew of T. H.'s dangerous history, and T. H.'s institutional files reflected this same history, then Jones' professed ignorance is either not believable on its face or evidences such a disregard of patient conditions and risks as to satisfy the highest degree of indifference to her duties of patient care and protection.   In either event, it is inappropriate as a basis of summary judgment.

There is another important lesson from <u>Stinson</u> for the present case.  The defendants here seem to imply that Partlow patients who are victims of sexual assault must show that they or other patients have complained in the past of similar assaults.   This would be a highly inappropriate adaptation of a requirement in Title VII sexual harassment cases for a victim to complain, invoke the available grievance systems, or show an established history of tolerance for similar abuse.   Those requirements make some sense in the workplace, or perhaps even in jails where the employees and inmates have the physical and intellectual capacity to complain, but they are most inappropriate for a facility like Partlow.   Most employers now (and perhaps most jails) have sexual harassment policies prohibiting such conduct and

providing a mechanism for addressing employee complaints.   Although it has such a policy for the protection of its employees, Partlow does not have a similar policy for patients.   (Pl. Ex 11, Dep. of Corp. Rep. at p. 91).   Even if Partlow had an adequate policy, there is no reasonable expectation that most patients would be able either to understand the policy or make a complaint under it.   To require a record of prior complaints from Partlow patients as a precondition to a constitutional duty to protect them from sexual assault would be to establish a hurdle that almost no one could surmount.   Here, of course, T. H. had a well-documented history of sexual misdeeds, of which the defendants were fully aware.

Even if the determinative facts in Stinson were not so clearly distinguishable from those in the present case, it is the established law of this Circuit that patients in mental health facilities like Partlow are due an even higher standard of care and protection than inmates of correctional facilities.   Applying this clear duty of protection articulated in Youngberg v Romeo, the 11th Circuit held:

> ... Romeo established that the involuntarily civilly committed were due a higher standard of care than the criminally committed; persons subjected to involuntary civil commitment are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 102 S. Ct. at 2461.

Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir. Ala. 1996).

Thus, for purposes of the qualified immunity defense raised to the 1983 claims, the individual defendants were fully on notice of their heightened legal duty to protect patients under their care from assault and in these factual circumstances were deliberately indifferent to fulfilling that obligation.

## C.    STATE LAW CLAIMS

The individual employees acted beyond their authority by failing to follow at least five nondiscretionary policies of the Department in their supervision of Rod. Thus, they cannot meet their burden of proof that the claims against them "arise from a function that would entitle the State agent to immunity."   Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003).

State agents are generally immune from liability when their conduct involves formulating plans, exercising judgment in administering a department or agency, allocating resources, hiring, firing and supervising and other discretionary functions. Ex parte Jones, - - So.3d - -, 2010 WL 2546419, *3-4 (Ala. 2010).   However, state agents "shall not be immune" "when the State agent acts" "beyond his [ ] authority" or acts "in bad faith."[12] Ex parte Jones at * 4. (Emphasis added).

---

[12]    "The 'bad faith' exception is described this way, '[I]f any employee failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist, or acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law, then it is possible that that employee would not be entitled to State-agent immunity.'"   Ex parte Butts, 775 So. 2d 173, 178 (Ala. 2000).

27

"A State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated in a checklist.'" Ex parte Butts, 775 So. 2d 173 (Ala. 2000); see also, Slack v. Stream, 988 So. 2d 516, 528-529 (Ala. 2008) (holding that a state-agent can be liable for failing to discharge the duties found in a checklist even when he is not aware of the existence of the checklist);   Ex parte Yancy, 8 So. 3d 299, 306 (Ala. 2008) (teacher who was not administrator had no immunity when student was hurt going to vehicle where student handbook stated that only the "administration" could give a student permission to go to the student parking lot during school hours); Ex parte Hudson, 866 So. 2d 1115 (Ala. 2003) (equipment buyer for school district not entitled to immunity where he failed to forward a maintenance manual for school bleachers that subsequently collapsed on a student); Town of Loxley v. Coleman, 720 So. 2d 907, 909 (Ala. 1998) (prison guard denied immunity after injuring prisoner during transport while attempting to avoid potholes); Giambrone v. Douglas, 874 So.2d at 1055 (denying immunity high school wrestling coach when student was seriously injured in a wrestling match prohibited by a handbook not adopted by the school board but used in the athletic department); Howard v. City of Atmore, 887 So.2d 201, 209 (Ala. 2003) (jail guard was not immune following

28

prisoner's suicide when jail's Standard Operating Procedure required officer to check inmate every thirty (30) minutes).

In <u>Ex parte Department of Mental Health and Mental Retardation</u>, 937 So.2d 1018, 1028 (Ala. 2006), the Supreme Court held that employees of the Department were not immune from claims of violating policies of the Department in failing to intervene in an employee assault on a patient.[13] Employees at the Department's Tarwater facility claimed that they were immune from suit because they were discharging "the duties imposed upon them." <u>Id.</u> Stated differently, they claimed that they had discretion in whether or not to intervene.

Justice See, writing for the majority, found that the employees presented no evidence that "they were adhering to a specific rule or regulation" when they failed to intervene on the patient's behalf nor could they demonstrate that they had any discretion in following the intervention requirement. <u>Id.</u>  The Court held that the employees were not entitled to state agent immunity. <u>Id.</u>

On February 29, 2008, Rod was raped by his roommate.  (Pl.'s Ex. 12, Declaration of R. G.).   The person responsible for monitoring Rod on this day was Stanley Gay, a MHW I at Partlow.   (Pl.'s Ex. 13, Accountability Sheet for Rod at 1).

---

[13]   The Department policy applicable to patient abuse, neglect and mistreatment is Policy 19-10, one of the same policies and procedures at issue in the present case.

The MHW III responsible for the supervision of Home 3, Unit 10 was Veronica Jones.   (Pl.'s Ex. 9, Depo of Jones at 57).

On March 5, 2008, Rod reported the rape to MHW I Gerald Boyd.   (Pl.'s Ex. 23, Depo of Boyd at 40-41).   Rod told Boyd that his roommate, T. H., held Rod down, removed Rod's diaper and "[s]tuck it in his butt."   (Pl.'s Ex. 23, Depo of Boyd at 40-41).   Rod also reported that Gay was right outside Rod's door when T. H. raped him.   (Pl.'s Ex. 12, Declaration of R. G.).

Stanley Gay and Veronica Jones were responsible for monitoring Rod on the evening of February 29, 2008.   Gay is precluded from claiming state-agent immunity because he violated a minimum of five detailed, nondiscretionary rules and regulations of the Department, leading to the rape of Rod

Because all of Gay's duties are ministerial and nondiscretionary he cannot meet his burden to prove that he was "formulating plans", "exercising judgment in administering a department or agency", "allocating resources", "hiring, firing" or "supervising".   See Ex parte Jones, - - So.3d - -, 2010 WL 2546419, *3-4 (Ala. 2010).   See Ex parte Department of Mental Health and Mental Retardation, 937 So.2d at 1028.   Gay testified that has no discretion whatsoever in discharging his duties and that he   cannot make decisions independent of management.   (Pl.' Ex.

19, Depo of Gay at 38 and 16-17).   Nor could he fail to protect a patient from assault:

"Q   You wouldn't have any discretion in whether or not you would protect him [Rod] from sexual assault while he's under your supervision?   A. I would not have that discretion, no, sir." (Pl.' Ex. 19, Depo of Gay at 38).   (Emphasis added).

Even a higher ranked employee would have no such discretion.   For example, Mental Health Worker II, Angela Sims, testified that there is no discretion in whether or not she can protect a patient from sexual abuse. (Pl.'s Ex. 16, Depo of Sims at 19, 29-30).

The rules designed to protect Rod were not abstractions. Before Rod was raped, Gay knew that T. H. had sexually assaulted other male patients in Unit 3. Gay told Rod's mother that she needed to get Rod out of Partlow because his roommate, T. H, had raped three or four other patients at Partlow.   (Pl.'s Ex. 24, Depo of C. G. at 127-131).[14]

### 1.   FIRST DUTY VIOLATED

Each patient at Partlow, including Rod and T.H., has a Special Considerations sheet that provides detailed instructions for each MHW to follow in the day-to-day

---

[14]   Veronica Jones testified that she was unaware of T. H.'s sexual history.   (Pl.'s Ex. 9 at 57). This testimony lacks credibility where the MHW's and the facility Director knew of T. H.'s history.

31

care of that particular patient.   (Pl.'s Ex. 11, Depo of Bellah at 99, 100).

Ms. Bellah, as the corporate representative for the Department, testified that MHW's are required to follow the Special Considerations Sheets to the letter.   (Pl.'s Ex. 11, Depo of Rebecca Bellah at 99).   "Q.   [A]n employee wouldn't be able to decide whether they wanted to follow the special considerations or not, would they? They would have to follow them?   A.   They would have to follow."   (Pl.'s Ex. 11, Depo of Bellah at 100-101).

Angela Sims, MHW II, testified that employees <u>cannot</u> deviate from the Special Considerations sheets:   ( "Q. They cannot deviate in any way from those special considerations for a particular patient?   A. No.   Q.   That was true in 2008? A.   Yes."   (Pl.'s Ex. 16, Depo of Sims at 51-52).

Ms. Bellah described the sheet this way, "[t]he special considerations sheet is something that all staff are instructed to read, to follow, to know, and you've got to look at it every day. It's actually in a notebook that goes with them wherever they go." (Pl.'s Ex. 11, Depo of Bellah at 70).

There is one very important and detailed instruction in Rod's Special Considerations sheet that is crucial to the immunity issue in this case.  His sheet <u>required</u> that MHW's "<u>Always position yourself between [Rod] and other clients</u>" (Special Considerations Sheet at 2). (Emphasis added).

32

T. H. raped Rod on February 29, 2008, during Stanley Gay's shift.   Gay was required to position himself between Rod and other clients, including T. H.   When he failed to discharge this detailed rule, Gay acted beyond his authority and has no immunity from such conduct.

In Ex parte Watson, 37 So. 3d 752 (Ala. 2009), a DHR child-abuse investigator was denied immunity following the death of a child when the investigator was supposed to have investigated the mother's boyfriend for alleged cocaine use.   The investigator's supervisor provided her with a memorandum requiring her to investigate the boyfriend.   She did not perform the investigation as directed.   The Court found that her failure to follow the memorandum constituted action beyond the investigator's authority, thus denying her immunity.   Ex parte Watson at 762.

## 2.   SECOND DUTY VIOLATED

The Department has a strict rule that, when two patients are alone in a bedroom together, a MHW I must constantly monitor that bedroom.   Rod and T. H. were alone together in the bedroom on February 29, 2008 when Rod was raped. Gay violated his nondischargeable duty to constantly monitor the bedroom and has no immunity as a result.   This rule is evidenced by an earlier written reprimand of Stanley Gay that states:

33

"On December 27, 2003, you worked on Apartment 10C.[15]   During your shift, two of the clients were in the bedroom together which should not have occurred with appropriate monitoring. It is critical to maintain close supervision of all clients on Apartment 10C at all times." (Pl.'s Ex. 22, Written Reprimand of Stanley Gay).   (Emphasis added).

MHW I's, II's and III's testified that this is a rule that is strictly enforced. Gerald Boyd testified that Partlow policy clearly required that employees monitor the bedroom whenever two patients were in the bedroom together by sitting inside the bedroom or outside in the hallway where they could see into all the bedrooms. (Pl.'s Ex. 23, Depo of Gerald Boyd at 31-32, 48, 51-53).   When Rod was being monitored in his bedroom, an employee had to be "[i]nside the doorway itself, especially if there is another individual in the room."   (Pl.'s Ex. 23 at 26-27, 53). Veronica Jones, as the highest-ranking MHW, testified that, if she came into Home 10 and found two patients in a room together and an employee was not monitoring the bedroom, she would reprimand the employee.   (Pl.'s Ex. 9, Depo of Jones at 28). (Emphasis added).   Likewise, Angela Sims testified that if two patients were alone in a room together, a MHW must be at the door.   (Pl.'s Ex. 16, Depo of Sims at 42).

Rod stated that Gay saw him and T. H. in the bedroom together.   Either Gay did nothing to stop the rape, which is a violation of policy, or he was not looking into the room monitoring the patient, as he was required to do.   Either way, Gay   is not

---

[15]   Rod lived in Home 10, Apartment **D**.   Home 10, Apartment D is in the same building as Home 10, Apartment C.   (Depo of Gay at 86; see also Written Reprimand of Gay of February 2, 2003).

entitled to immunity.

### 3.    THIRD DUTY VIOLATED

Another nondischargeable duty of a MHW I requires intervention if patients are found engaging in sexual contact.   If a MHW sees two patients engaged in sex, the worker is supposed to intervene and separate the patients.   (Pl.'s Ex. 11, Depo of Bellah at 37).    If a patient is sexually assaulted while someone is supposed to be watching the bedroom, the MHW has violated Department policy by not intervening.   (Pl.'s Ex. 16, Depo of Sims at 47).   Veronica Jones testified that, if a patient complains that a staff member saw him being sexually assaulted and the employee didn't report it, that would be a clear violation of Department policy. (Pl.'s Ex. 9, Depo of Veronica Jones at 29).

Gay was right outside Rod's door when T. H. raped him.   (Declaration of R. G.).   Gay was either watching it and did nothing or was being so inattentive that he failed to stop it.   Either way, failing to intervene is a direct violation of a nondiscretionary Department policy that precludes immunity.

### 4.    FOURTH   DUTY VIOLATED

Partlow has a specific and nondiscretionary policy and procedure that prohibits abuse, neglect, mistreatment or exploitation of patients:

"Any form of client abuse, neglect, exploitation or mistreatment will not be tolerated. The DMH will immediately investigate and provide for appropriate legal

35

and administrative actions based upon such investigation in any state-operated facility." (Pl.'s Ex. 18, DMH Policy 19-10).

"All employees shall be governed by this policy and made aware of its contents." (Pl.' Ex. 18 at 2).   This policy was the subject of <u>Ex parte Department of Mental Health</u>, 937 So.2d 1018, 1028 (Ala. 2006).   It is designed for the protection of patients and a MHW has no discretion in whether or not to protect a patient from sexual abuse.   (Pl.'s Ex. 9, Depo of Veronica Jones at 22)(Pl.'s Ex. 16, Depo of Sims at 30).

Gay admitted that if Rod was sexually assaulted on a night when Gay was responsible for supervising him, then Gay violated Department policy. (Pl.'s Ex. 19, Depo of Gay at 37).   He would be required to protect Rod from sexual assault. (Pl.'s Ex. 19, Depo of Gay at 38).   "Q. And you didn't have any discretion about whether or not you could violate the abuse, neglect and exploitation policy, did you? A. No, sir." (Pl.'s Ex. 19 at 21).   (Emphasis added).

Michael Bailey was a MHW I also responsible for monitoring Rod. He testified that, if Rod was under his supervision and it was later determined that Rod was sexually assaulted, Bailey would be in violation of Department policy.   (Pl.'s Ex. 20, Depo of Bailey at 32-33).

### 5.    FIFTH DUTY VIOLATED

Patients at Partlow are not allowed to engage in any sex whatsoever, including

consensual sex. (Pl.'s Ex. 11, Depo of Rebecca Bellah at 23-24). "Q. If Mr. Gay was responsible for watching him [Rod] and he had sex with another patient, is Mr. Gay responsible in any way for that?   A. That would be a situation of neglect, yes, there would be disciplinary action for Mr. Gay." (Pl.'s Ex. 11, Depo of Bellah at 101). (Emphasis added).

Gay admitted that Partlow patients are never allowed to have sex.   (Pl.'s Ex. 19, Depo of Gay at 24).   "Q. So if a client under your care was engaged even in a consensual sexual act while he was under your care, it would be considered neglect on your part? A.   Because they're not supposed to do that anyway." (Pl.'s Ex. 19 at 22-23).

## VI.   CONCLUSION

For the foregoing reasons the defendants' motion for summary judgment should be denied.

Respectfully submitted:


/s Stanley J. Murphy
Stanley J. Murphy
Murphy & Murphy, LLC
P.O. Box 3163
Tuscaloosa, AL   35403

 J. Michael Comer
J. Michael Comer
Patterson Comer
303 Main Ave., Ste. A
Northport, AL 35476

## CERTIFICATE OF SERVICE

A copy of the above and foregoing was served on all parties listed below on this 24th day of February, 2011, by uploading a copy of the Brief to the Court's ECF website.

Nancy Jones, Esq.
Tommy Klinner, Esq.

 /s J. Michael Comer
Of Counsel

38